CITY OF ST. LOUIS, Petitioner,

v.

DEPARTMENT OF
TRANSPORTATION,
Respondent;

American Airlines, Inc., Intervenor.

CITY OF ST. LOUIS; Airline Pilots Association, International; Independent Federation of Flight Attendants; and International Association of Machinists and Aerospace Workers, Petitioners,

v.

DEPARTMENT OF
TRANSPORTATION,
Respondent;

American Airlines, Inc., Trans World Airlines, Inc., and USAir, Inc., Intervenors.

Nos. 91–1244, 91–1916.

United States Court of Appeals,
Eighth Circuit.

Submitted May 31, 1991.

Decided June 28, 1991.

Rehearing and Rehearing En Banc Denied Aug. 27, 1991.

Edward J. Hanlon, St. Louis, Mo., and Susan B. Jollie, Washington, D.C. (argued), Gary Green, Russell Bailey, Jerry Anker, Anita M. Mosner, Allison Beck, Mark Schneider, Washington, D.C. and Julian L. Bush, St. Louis, Mo., on brief, for petitioners.

Paul M. Geier, Washington, D.C., and Joe Sims, Washington, D.C. (argued), James F. Rill, Robert B. Nicholson, David Seidman, Mary B. Reed, Thomas L. Ray, Alexander J. Millard, Washington, D.C., on brief, for appellee.

Richard A. Rothman (argued), Ira M. Millstein and Gloria C. Phares, New York City, and Peter D. Isakoff and Annemargaret Connolly, Washington, D.C., Weil, Gotshal & Manges, on brief, for American Airlines.

Before ARNOLD, JOHN R. GIBSON and BEAM, Circuit Judges.

ARNOLD, Circuit Judge.

In this case we have before us for review two orders of the Department of Transportation approving the sale of foreign airline routes by Trans World Airlines, Inc. (TWA), to American Airlines, Inc. (American). In No. 91–1244, the order being challenged, Department of Transportation (DOT) Order 91–1–72, was issued in docket number 46752 on January 30, 1991. It approves the transfer from TWA to American of TWA's Chicago–London route authority. In No. 91–1916, the order being challenged is Department of Transportation Order 91–4–47, issued in docket number 47320 on April 24, 1991. This order approves the transfer of three London routes, those originating in New York, Boston, and Los Angeles. The order with respect to the Chicago route became effective on January 31, 1991. The order with respect to the other three routes is scheduled

to become effective on July 1, 1991. The City of St. Louis is the sole petitioner challenging the Chicago order. The other order is attacked by the City of St. Louis and three labor organizations representing employees of TWA.

This matter first came to our attention when the City of St. Louis and the other petitioners in No. 91–1916 applied to us for an emergency stay. The transaction transferring the New York, Boston, and Los Angeles-to-London routes, they said, was about to be closed, and a stay was necessary to preserve the status quo during our review of the order. On May 7, 1991, we denied the stay. The transaction had already been closed as between TWA and American. At the same time, however, we expedited the petition for review and set the case for oral argument in St. Louis on May 31, 1991, in order to be in a position to make a decision on the merits of the petition before July 1, when the route transfer was to become effective under the terms of the action taken by DOT. Later, we consolidated the Chicago petition with the New York–Boston–Los Angeles petition, and interested airlines were allowed to intervene.

Having now heard the oral argument and studied the briefs and records, we conclude that we have no authority to set aside either order. DOT's findings of fact are supported by substantial evidence. Its holding that both transfers are in the "public interest," § 401(h) of the Federal Aviation Act of 1958, as amended, 49 U.S.C. App. § 1371(h), rests upon reasonable (and therefore permissible) interpretations of the various statutes involved. And its weighing of the various statutory ingredients of the "public interest" is not so far out of balance as to be arbitrary, capricious, or an abuse of discretion. Accordingly, the two orders under review are affirmed.

## I.

We briefly summarize the facts, leaving certain relevant details to those portions of the opinion that deal with particular arguments. TWA has held certificates, issued either by DOT or its predecessor agency, the Civil Aeronautics Board, authorizing it to serve London from Chicago, St. Louis, New York, Boston, Philadelphia, Baltimore, and Los Angeles. American has been serving London, under the authority of similar certificates, from Dallas–Fort Worth and Miami. The hub of TWA's domestic system is St. Louis. American has hubs at Chicago, Nashville, and other cities. The United States–United Kingdom market is also served by British carriers, including British Airways and Virgin Atlantic. British Airways serves London from five of the seven United States cities served by TWA. Historically, Pan American World Airways and TWA were the only two United States-flag passenger carriers allowed to use Heathrow Airport, the closest and therefore most desirable airport serving London. Pan American's certificates have recently been transferred to United Airlines.

In December of 1989, TWA agreed to sell its Chicago–London route authority to American for about 110 million dollars. TWA and American filed an application with DOT for approval of the transfer under § 401(h). Under this statute, "[n]o certificate may be transferred unless such transfer is approved by the Board [now the Department of Transportation] as being consistent with the public interest." § 401(h)(1), 49 U.S.C.App. § 1371(h)(1). Then, in December of 1990, while the Chicago transfer application was still pending, TWA agreed to sell to American its six other London routes and certain other property for about 500 million dollars. DOT did not hold an oral evidentiary hearing. Instead, after reviewing the pleadings, it issued a show-cause order in the Chicago case. This order (91–1–12), issued on January 8, 1991, indicated a tentative disposition to approve the transfer and invited interested parties to comment. The City of St. Louis, among others, filed comments opposing the transfer. (The City had not previously participated in the Chicago proceeding.) In addition, the City asked that the two proceedings be consolidated. On January 30, 1991, the Department rejected the objections to the Chicago transfer, and it became effective the next day, January 31, 1991.

In the meantime, the other case, involving TWA's remaining six London routes, was proceeding separately. As in the Chicago case, DOT proceeded by way of a show-cause order. The order (No. 91–3–28), entered on March 14, 1991, indicated a tentative decision to approve the application in part only. The New York, Boston, and Los Angeles route transfers would be approved, but TWA would keep its St. Louis–London authority, and the Philadelphia and Baltimore routes would be transferred to another carrier. The City of St. Louis and three unions representing TWA employees, Airline Pilots Association, International, the International Federation of Flight Attendants, and the International Association of Machinists and Aerospace Workers, filed comments opposing the tentative decision indicated in the show-cause order. DOT considered these comments, again without an oral evidentiary hearing, and, in an order entered on April 24, 1991, rejected them. This order diverged somewhat from the tentative decision contained in the show-cause order. It approved the transfer to American of the New York, Boston, and Los Angeles routes, but provided that TWA would keep not only its St. Louis authority, but also the Baltimore and Philadelphia-to-London routes.

These two decisions are now before us for review.

## II.

■ The Department of Transportation's first line of defense is that the petitioners have no standing, in the Article III sense, to challenge these orders. Therefore, DOT says, the petitions should be dismissed for want of jurisdiction. The Department correctly points out that the mere fact that petitioners were parties in the agency proceeding is not dispositive of the issue of standing for purposes of invoking the jurisdiction of a federal court. Agencies are not Article III creatures, and Congress may allow anyone it wishes, including members of the public at large, to become parties in agency proceedings. When the case gets to court, though, the courts must independently satisfy themselves that the Article III requirement that a case or controversy be presented is satisfied. DOT also correctly states the standard which we must apply: parties seeking review must show an injury resulting from the challenged agency decision, and that the lawsuit is likely to redress the injury. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982).

■ The word "show" in this formulation must be understood in a special way, however. If it means that full proof, on the merits, must demonstrate injury to a complaining party, failing which the proceeding must be dismissed for lack of jurisdiction, the question whether threshold jurisdictional requirements have been met will not be decided, in many instances, until the court has investigated and determined the merits of the case exactly as it would if it had jurisdiction. Jurisdictional requirements, as a rule, are better determined at the outset, so that, if they are not met, the court can dispose of the case and turn its attention to matters it has power to deal with. Thus, in the context of standing, it is the nonfrivolous claims of a party that are determinative, not whether the party can sustain those claims by proof on the merits. As the Supreme Court said in *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." If the complaint (or, as here, the petition for review) makes a nonfrivolous or colorable claim of injury, that the injury is due in significant part to the agency action being questioned, and that the courts, if they rule for the complaining party, can redress the injury, no more is required to satisfy Article III. "[A] probabilistic benefit from winning a suit is enough 'injury in fact' ... to confer standing in the undemanding Article III sense." *North Shore Gas Co. v. Environmental Protection Agency*, 930 F.2d 1239, 1242 (7th Cir.1991) (citations omitted).

■ Here, the City of St. Louis alleges interests that would be vitally affected if, as it claims, TWA's financial viability will be seriously jeopardized by the agency action in question. The City owns the Lambert–St. Louis International Airport, which is a major TWA hub. TWA provides about 80 per cent. of the air service to the City. Union petitioners, likewise, have a vital interest: the livelihood of thousands of their members depends on the survival of TWA. Certainly it is debatable whether the transactions in question will prove fatal to TWA. The agency found that they will not. But that debate is part of the case on the merits. One of the key questions on the merits is whether the agency finding that the route transfers will improve TWA's viability is supported by substantial evidence. Our decision in *Brotherhood of Railway Carmen v. Interstate Commerce Commission*, 917 F.2d 1136 (8th Cir.1990) (per curiam), is directly in point. There, a federal agency had approved a business combination. A union representing the employees of one of the affected railroads brought a petition for review. The agency claimed a lack of standing. It argued that the union's assertions that the railroad would not be viable in the future if the agency action stood were too speculative. We rejected the standing defense. We took the position, which we take also in the present case, that a nonfrivolous claim of injury caused by the agency action was sufficient to confer standing, and that the questions of injury in fact, the causal link with the agency action, and so forth were better addressed on the merits.

We hold that the petitioners have standing to contest the orders in question, and that we have jurisdiction of these petitions.

### III.

A vital aspect of a correct analysis of these cases is to determine the proper scope and standard of review. How much should we defer to the Department of Transportation? What legal formulas describe our function? Are there special aspects of the case that require us, in applying these standards, to adjust the judicial antennae so as to be more or less sensitive?

■ There is little explicit disagreement among the parties as to what the standard of review should be, though naturally they state the standard with different emphasis. To the extent that the decisions in question rest on findings of fact, we are obliged to uphold them if they are supported by substantial evidence. The agency's interpretation of its governing statutes presents, of course, a question of law, and courts normally review questions of law de novo, but that rule does not apply in the present context. Congress has specially assigned to the Department of Transportation the responsibility of interpreting and administering the statutes in question, including the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705. The Supreme Court has many times made clear that this sort of question of law is for the agency to decide, so long as its interpretation of the statute is reasonable. *E.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 864–66, 104 S.Ct. 2778, 2792–93, 81 L.Ed.2d 694 (1984). And, when we come to review the agency's ultimate judgment, the decision of what is in the "public interest" in view of the various factors involved, we may not disturb this weighing unless it is arbitrary, capricious, or an abuse of discretion. To say that an agency (or a lower court) has "discretion," or that a certain question is "discretionary," is not to say that the agency may do whatever it wishes. This formulation simply recognizes that many legal questions are imprecise. They involve a number of factors that cannot be quantified, no one of which is dispositive in every case. So long as the agency considers all of the relevant factors, is not significantly influenced by any irrelevant factor, and comes up with a conclusion after mixing all the proper factors together that is not clearly wrong, there is no abuse of discretion, and we must affirm. Compare *Kern v. TXO Production Corp.*, 738 F.2d 968, 970 (8th Cir.1984) (similar definition of abuse of discretion employed in reviewing a trial court's decision to allow a nonsuit without imposition of financial conditions).

■ A few aspects of the present case deserve special notice in this context. In the first place, the ultimate question is whether the route transfers are "consistent with the public interest." § 401(h) of the Federal Aviation Act, 49 U.S.C.App. § 1371(h). This is a general standard, to say the least, and there is necessarily a lot of room for argument in applying it. Congress wants the standard defined, in the first instance and in the main, by the Department of Transportation, which has much more specialized experience, if not expertise, than generalist judges do. As the Supreme Court stated in *Federal Communications Commission v. WNCN Listeners Guild,* 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981):

> [T]he Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference.... The Commission's implementation of the public-interest standard, when based on a rational weighing of competing policies, is not to be set aside by the Court of Appeals, for *"the weighing of policies under the 'public interest' standard is a task that Congress has delegated to the Commission in the first instance."*

(Quoting *Federal Communications Commission v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 810, 98 S.Ct. 2096, 2119, 56 L.Ed.2d 697 (1978), emphasis ours.) The more general the statutory language, the more judges must of necessity defer to the agency, because Congress expects the agency's special knowledge and experience to flesh out the general language it adopted. If Congress could have agreed upon a formulation more precise, and therefore easier to interpret, it presumably would have enacted it. Having failed to do so, it in effect delegated a large portion of policy-determining power to a chosen vessel, here DOT. (No one claims, incidentally, that the delegation here was so broad as to violate Article I.)

■ It is also significant that the major judgments that the agency must make un-

der the statute (for example, the effects of the transaction on the viability of each of the carriers involved, on competition in the domestic airline industry, and on the trade position of the United States in the international air-transportation market) are predictive. They involve forecasts of the future. This is the sort of question on which judicial deference is especially important. It involves not so much determining what happened in the past, the sort of question of fact more familiar to courts, as determining what will happen in the future. Such forecasts must be accepted "if they are rational, based on a consideration of all the relevant factors, and adequately explained." *Republic Airlines v. Civil Aeronautics Board,* 756 F.2d 1304, 1318 (8th Cir.1985) (citation and quotation omitted). On the other hand, as petitioners remind us, the Department's forecasts are based in part on what it thinks happened in the past, and on what it thinks competitive conditions are today. These sorts of issues are traditional questions of fact, reviewable here under the familiar substantial-evidence standard.

■ Furthermore, petitioners rightly emphasize that DOT did not proceed, as it could have, by way of a traditional oral evidentiary hearing. It did not even allow for discovery in the form of requests for production of documents or depositions on written interrogatories. Instead, it made a tentative decision on the basis of pleadings, entered a show-cause order embodying that decision, and then made its final decision on the basis of comments directed to the show-cause order. A great deal of documentary evidence on both sides was received, but proceeding in this way necessarily produces factual conclusions that are in general somewhat shakier than the product of a trial-type hearing. For this reason, we agree with petitioners that our level of deference should be somewhat lower than it would have been if an evidentiary hearing had been held. See *United States v. Civil Aeronautics Board,* 511 F.2d 1315, 1325 (D.C.Cir.1975).[1]

---

**1.** We disagree, however, with the related contention that DOT abused its discretion in not holding an oral evidentiary hearing here, and that the cases should be remanded for this reason

## IV.

In order to put the petitioners' contentions in context, we start with a brief account of the history of federal regulation of air transportation. Traditionally, airline service, foreign and domestic, was closely regulated. In 1978 Congress changed this policy fundamentally. The Airline Deregulation Act, Pub.L. No. 95–504, 92 Stat. 1705 (1978), followed closely by the International Air Transportation Competition Act, Pub.L. No. 96–192, 94 Stat. 35 (1980), abolished the Civil Aeronautics Board, the former regulatory agency, as of 1984, and opened up domestic airline service to any certificated air carrier. Certificates for domestic service became valid for all routes. Foreign service, of course, could not be deregulated quite so thoroughly, because foreign countries can and usually do limit the number of American-flag airlines allowed to serve routes between the United States and themselves. Entry into such routes is limited. If agreement with a foreign nation or the cessation of service by a certified carrier creates a vacancy, so to speak, the Department of Transportation, which administers what is left of the CAB's regulatory power, typically opens the route up to competitive applications, and selects the carrier it thinks best able to handle the business. In addition, however, a carrier authorized to operate over a certain route may, with the permission of the Department, transfer the route to another carrier. Up until 1990, the statute governing such transfers, § 401(h)(1) of the Federal Aviation Act of 1958, as amended, 42 U.S.C.App. § 1371(h)(1), read as follows:

(1) No certificate may be transferred unless such transfer is approved by [the Department of Transportation] as being consistent with the public interest.

Section 9127 of the Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, 104 Stat. 1388–371, which became law on November 5, 1990, added two new paragraphs to subsection (h). The new provisions, on which petitioners lay great stress, read as follows:

(2) CERTIFICATION.—The Secretary of Transportation shall, upon any transfer of a certificate, certify to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Public Works and Transportation of the House of Representatives that the transfer is consistent with the public interest.

(3) ACCOMPANYING REPORT.—A certification under this subsection shall be accompanied by a report analyzing the effects of the transfer on—

(A) the viability of each of the carriers involved in the transfer;

(B) competition in the domestic airline industry, and

(C) the trade position of the United States in the international air transportation market.

It is apparent that the key criterion for administrative action is "the public interest." The phrase, as noted, is extremely broad, but the statute has not left the agency completely at large in its interpretation. Another provision, 49 U.S.C.App.

alone. Petitioners do not argue that either any statute or the Constitution required an evidentiary hearing. Their reliance, instead, is on a regulation of the Department, 14 C.F.R. § 302.1770(b) (1991). This regulation provides that an oral evidentiary hearing will be held if DOT decides that "[m]aterial issues of decisional fact cannot *adequately* be resolved without oral evidentiary hearing procedures...." (Emphasis ours.) The key word in this provision is "adequately." Certainly there are important material issues of decisional fact, the kind of issues that would require a jury trial if this were a civil action in a federal court. But it is not a civil action. It is an administrative proceeding as to which Congress has not explicitly required any given type of procedure. Whether DOT's

show-cause practice is "adequate" to resolve the questions of fact presented here is for the Department itself to decide, within very broad limits, limits that were not exceeded here. This is not the first case in which show-cause procedures have been used to decide route-transfer questions, and the agency could permissibly conclude that it was important enough to decide these cases quickly to dispense with trial-type hearings. Interpretation of the agency's regulation is, in most cases, best left to the agency itself, and the deference we give an agency's interpretation of its own rules is even greater than the deference due its interpretation of it governing statutes. We hold that the agency did not abuse its discretion by using the show-cause procedure.

§ 1302(a), particularizes the concept of "the public interest" by listing a number of factors that the Department should consider. Section 1302(a) contains 12 paragraphs, among which the following are relevant in the present case:

(3) The availability of a variety of adequate, economic, efficient, and low-price services by air carriers and foreign air carriers....

(4) The placement of maximum reliance on competitive market forces and on actual and potential competition (A) to provide the needed air transportation system, and (B) to encourage efficient and well-managed carriers to earn adequate profits and to attract capital, taking account, nevertheless, of material differences, if any, which may exist between interstate and overseas air transportation, on the one hand, and foreign air transportation, on the other.

\* \* \* \* \* \*

(9) The encouragement, development, and maintenance of an air transportation system relying on actual and potential competition to provide efficiency, innovation, and low prices, and to determine the variety, quality, and price of air transportation services.

\* \* \* \* \* \*

(11) The promotion, encouragement, and development of civil aeronautics and a viable, privately owned United States air transport industry.

(12) The strengthening of the competitive position of United States air carriers to at least assure equality with foreign air carriers, including the attainment of opportunities for United States air carriers to maintain and increase their profitability, in foreign air transportation.

We read the 1990 amendment to add three more factors to the list (and these are the factors, as it happens, that the parties argue most about in this case). The amendment, which we have set out above, does not say in so many words that the statutory list of factors relevant to the public interest is being changed or expanded, but there is no other sensible way to read it. The statute requires the Secretary of Transportation to certify to the relevant committees of the Congress that the transfer is consistent with the public interest, a requirement that does no more than ensure that the members of Congress with the most direct substantive interest are made aware that a route transfer has been approved. Paragraph (3), however, is more pointed. It requires the Secretary, in connection with the certification of the public-interest finding, to analyze three listed factors. Obviously, Congress thought these factors, none of which is listed in quite the same terms in § 1302(a), had something to do with the public interest. New factor (C), having to do with the trade position of this country in the international market for air transportation, could be read as a shorter restatement of § 1302(a)(12), referring to "[t]he strengthening of the competitive position of United States air carriers" vis-à-vis "foreign air carriers." And new factor (B), referring to "competition in the domestic airline industry," is a variation on the theme already contained in § 1302(a)(9)—"[t]he ... development ... of an air transportation system relying on ... competition...." But new factor (A), "the viability of each of the carriers involved in the transfer," is more particularized and specific than any of the paragraphs of § 1302(a). This subparagraph (A), though it certainly relates to the state of competition, both foreign and domestic, also focuses on the particular carriers involved, and requires that their financial viability be specifically analyzed. At least as to this subparagraph (A), therefore, we conclude that the 1990 amendment is more than a mere procedural or reporting requirement. It does require a report, to be sure, and Congress may react, or not, as it chooses, to this report. But it also makes clear something that was at most implicit in the unamended law: the viability of the carriers involved in the transfer is a factor relevant to the Department's judgment on the overall question of the public interest.

Against this statutory background, then, we consider the petitioners' contentions. We mention a couple of general arguments first. Petitioners say that the

Department has abdicated its responsibility, that it has become nothing more than a rubber stamp for private business decisions. They quote language from the Department's order which indicates a large degree of deference to private decision-making, and claim that this language amounts to "an irrebuttable presumption" in favor of approving whatever two carriers have agreed to. Petitioners make disparaging references to the Department's "*laissez faire* policy" and its undue reliance on "the invisible hand." We think the arguments are overstated. What the Department is doing here amounts not at all to an irrebuttable presumption. It is, instead, a sort of rebuttable presumption: the fact that American and TWA want the transfer, that American is willing to pay over half a billion dollars for the routes, and that TWA believes that it needs the cash more than it needs the routes, makes the transaction, on its face, a presumptively good one for the carriers and for air transportation in general. We find no fault with this general orientation. Congress, after all, decided to deregulate the industry in large part, and this necessarily means that more decision-making power is going to be exercised by private individuals than under the old law.

Furthermore, § 1302(a)(4) refers expressly to "[t]he placement of maximum reliance on competitive market forces...." It is true, as petitioners point out, that the same paragraph (4) cautions that differences, if any, between domestic and foreign air transportation must be taken into account, but we do not believe this language detracts from the validity of the Department's general disposition in favor of private economic choice. Entry into the foreign air-transportation market is limited, to be sure, and the number of carriers and routes cannot be increased without the permission of the foreign country involved—in this case, the United Kingdom. What is directly at stake here, however, is not the market for air transportation as such, but rather the market for foreign routes, for the governmental permissions that a carrier must obtain to carry people between this country and another. All other things be-

ing equal, we think it rational to assume that free trade, so to speak, among air carriers in these routes will, over the long run, allocate them in the most efficient way. That assumption, at any rate, seems to be the Department's guiding light, and we see nothing in the statute to outlaw it.

Petitioners emphasize that the Department must carefully consider the effect of the transfer on the viability of TWA. They seem almost to argue that the statute forbids the transaction unless it would improve TWA's financial condition. This argument is based mainly upon the 1990 amendment. We are unable to agree, for two reasons. In the first place, the amendment simply doesn't say this. The viability of TWA is certainly a factor, and the amendment makes this clear, if it was not clear before, but the amendment does not even begin to establish that this factor is an indispensable one. Second, the legislative history of the amendment and predecessor proposals makes the point unmistakable. Section 708 of S 3094, 101st Cong., 2d Sess., the original version of the legislation that ultimately found its way into the Omnibus Budget Reconciliation Act, would have provided that a route transfer "is consistent with the public interest if that transfer does not adversely affect ... the viability of each of the carriers involved in the transfer." 136 Cong.Rec. S 13624 (daily ed., Sept. 24, 1990). This language was in the Omnibus Budget Reconciliation bill as it passed the Senate, 136 Cong.Rec. S 15879 (daily ed., Oct. 18, 1990), but in conference it was rejected in favor of the provision as ultimately enacted. What would have been a rule of law (transfers that hurt viability are forbidden) became instead a sort of signal, a nudge from Congress to the Department (don't approve a transfer until you have thought carefully about viability).

Petitioners also make a number of more detailed arguments, focusing closely on the three factors listed in the 1990 amendment. We turn now to a consideration of these points, discussing first the earlier and simpler of the two cases, No. 91–1244, involving only the one Chicago-to-London route,

and then the multi-route case that follows it.

## V.

 The City of St. Louis, the sole petitioner in the Chicago case, argues first that it was error for the Department of Transportation to deny its motion to consolidate the Chicago proceeding with the multi-route proceeding. Procedural issues like consolidation lie largely within the discretion of the agency, and we see no abuse of that discretion here. The Chicago proceeding was already well along when the multi-route case was filed, and the delay that would have been occasioned in the Chicago case by consolidating it with the newer and more complicated multi-route case was a legitimate consideration pointing against consolidation. Moreover, as events have unfolded in the two proceedings, little would have been gained by consolidation, even accepting petitioners' theory that it was important for the records in the two cases to be considered together. When it came time for the Department to decide the multi-route case, it of course knew that the Chicago transfer had already been approved, and it therefore necessarily considered the multi-route case in that context. At the time the multi-route case was decided, therefore, there had been a sort of de facto consolidation of the two proceedings. Furthermore, we have consolidated both petitions for review in this Court, and we can therefore consider the two records together. In these circumstances, whatever difference an earlier consolidation of the two cases at the agency level would have made is not significant enough to override the agency's basic right to control its own docket.

 Petitioner also challenges the Chicago order as a substantive matter, but it does not directly argue that any specific finding is unsupported by substantial evidence, or that the Department has failed to supply a reasoned explanation for its approval of the Chicago transfer. The argument, rather, is that the Department failed to consider properly the effects of the transfer on TWA's viability and on the domestic airline industry. (These two considerations, as will be made clear in more detail later, are intimately related: to the extent that TWA's viability is hurt, competition in the domestic airline industry is also necessarily adversely affected.) We reject this argument. In the first place, we cannot agree, for reasons already given, that the Department erred in adopting a rebuttable presumption in favor of private agreements by actors in the marketplace. We do not believe that transfer of this single route would even arguably jeopardize TWA's financial position. DOT has found that domestic competition will be enhanced, because American, the second largest carrier at O'Hare International Airport, will be better able to compete with the largest carrier, United. TWA relinquishes only a single daily round trip. It operates fewer than 20 departures from Chicago daily, while American and United together operate many hundreds. DOT's order, understandably much briefer than the later order in the multi-route case, is by no means perfunctory. It discusses in sufficient detail the public-interest factors, and we see no basis in law to set aside DOT's decision with respect to the Chicago–London route. Accordingly, in No. 91–1244 the order of the Department of Transportation will be affirmed.

## VI.

Most of the parties' energy in these two cases is directed to the multi-route proceeding, and we now turn to that case. We have already held that the three public-interest factors singled out for express mention in the recent amendment to § 401(h) are important considerations, and that they must be thoroughly analyzed by DOT. Petitioners' claims relate directly to these factors. They attack DOT's finding that American will be a stronger competitor than TWA in the London market as not supported by substantial evidence. They question on similar grounds DOT's finding with respect to the impact of the route sale on TWA's viability. And, echoing the argument just discussed in connection with the Chicago case, they argue that DOT

failed to consider seriously the implications of the three-route transfer on domestic air transportation service. Each of these contentions raises serious policy and factual questions, and we shall discuss them in turn.

### A.

■ DOT found that American's operations to London from New York, Los Angeles, and Boston will significantly enhance the U.S. trade position in the international market by providing more effective competition with the clearly dominant carrier in those markets, British Airways.

Order 91–4–47, slip op. 33 (Docket 47320, filed Apr. 24, 1991). This key finding—that American will be a stronger international competitor than TWA on the three routes transferred—is attacked as not being supported by substantial evidence.

Petitioners argue that TWA can carry more passengers on the routes in question than American. The number of flights is limited by international agreement, and TWA's airplanes (*e.g.*, 747's carrying between 431 and 437 passengers) are bigger than American's (*e.g.*, 747SP's carrying 245 passengers). It is said that some passengers now riding TWA will be lost to British Airways. American's own exhibits[2] show its projected numbers of passengers in 1993 from the three cities in question are lower than the corresponding numbers actually carried by TWA in 1989. Petitioners argue that TWA's position of strength at the JFK Airport makes it better able to serve New York-to-London travelers. TWA has 41 connecting domestic flights coming into JFK, while American has only 32. If American takes over the JFK-to-London route, therefore, fewer passengers will enjoy the convenience of an online connection: being able to change planes without changing airlines. In order to obtain the convenience of an online connection,

some passengers will have to switch to another American gateway (like Dallas–Ft. Worth), which may be less convenient than JFK. And, finally, it is said that DOT is behaving inconsistently by allowing TWA to keep its St. Louis-to-London route. St. Louis is a TWA hub, but so is JFK, so why should the two cities be treated differently?

These points are not all without force. Had DOT, on balance, elected to accept them, there would be substantial support in the record for its conclusion. The evidence countering petitioners' arguments, however, is also substantial, and this evidence, taken together with DOT's superior institutional knowledge of competition in the airline industry, persuades us that petitioners' position must be rejected. In the first place, petitioners do not deny that American has superior financial strength and reputation for quality service. A consumer survey referred to in the record gives American higher marks for service than TWA. (We are not saying, and DOT did not say, that TWA's service is in fact inferior. TWA has many courteous and helpful employees. But in commerce as in politics, perception is often important for its own sake, and the results of a consumer survey have independent competitive significance.) In the past, TWA has been competing against Pan Am, but Pan Am has now been replaced by a stronger carrier, United, so the numbers of passengers carried by TWA in the past are not necessarily a reliable indication of the numbers it would be able to carry in the future. Flights into Heathrow, the most convenient London airport, are limited, as petitioners urge, but the limitation expires after three years, and American can put on additional flights to Gatwick Airport, now used by large numbers of American travelers. Further, if traffic warrants, American can buy larger airplanes, and it will surely do so if demand is strong enough. TWA's planes are larg-

---

**2.** Confidential Appendix of Petitioners 17C, H, and J. The reference "Confidential Appendix" is used because the petitioners so designated it when it was filed. On motion of petitioners, which we granted in open court at the time of the oral argument on May 31, 1991, all material

originally filed as confidential has been made public. We refer to "confidential" materials when citing the record, only because some materials were originally so designated, and in order to avoid confusion about what is being cited.

er, but they have hardly been flying full, and they are getting old. TWA itself has been planning to replace its 747's with smaller Airbus aircraft. Pet.App. 52.

There are obviously conflicting factors here. Some point one way, some another. On balance, we hold that the historical facts found by DOT are supported by substantial evidence, and its resolution of the weight to be given the various conflicting factors is not arbitrary, capricious, or an abuse of discretion.

We find no fatal inconsistency in the different treatment accorded to TWA's St. Louis gateway. TWA has been strong at JFK; it has a domestic hub there. But its position at St. Louis is more than mere strength; it amounts to dominance. TWA provides 83 per cent. of all service at St. Louis, as opposed to a much smaller proportion of the total service at JFK. As DOT observed, "[n]o carrier other than TWA can proffer an equal or superior competitive influence on the U.S.–U.K. market from St. Louis...." Order 91–4–47, *supra*, slip op. 18. American's existing competitive strength at JFK is much closer to that of TWA than is American's existing competitive strength at St. Louis. Replacing TWA with American at St. Louis, therefore, would make much less sense than similar action at JFK. With 32 connecting flights, JFK is already something of an American hub. St. Louis is not. The distinction between the two gateways is rational and well supported in this record.

Accordingly, we hold that DOT did not err in finding that the United States' position in the international air transportation market would be improved by these route transfers.

### B.

The next factor, the effect of the transfers on TWA's viability, is the one with respect to which petitioners make their most persuasive arguments. They concede that TWA's present financial position is precarious. Without the transfers, it may be forced into bankruptcy, either voluntarily or on the petition of one of its creditors. Such an eventuality, however, is not necessarily all bad, we are told. Pan Am, Continental, and Midway are now operating under Chapter 11 of the Bankruptcy Code, and bankruptcy does offer an orderly and rational way of reorganizing a going business, flushing out the shareholders and junior creditors, and replacing them with senior creditors, who, as a practical matter, have the greatest real financial stake. TWA's foreign business has been the core of its operations, and the three London routes now proposed for transfer made an operating profit, for the year ended August 31, 1990, of more than 130 million dollars. To sell these routes, virtually the only profitable assets TWA has, will only doom it, petitioners argue. Furthermore, DOT did not even bother to inquire what TWA proposed to do with the more than half a billion dollars in cash to be paid to it by American in exchange for the four routes involved in these two cases. Petitioners asked DOT to put this question to TWA, but it refused, believing that by doing so it would intrude without warrant into private business decisionmaking.

We are troubled by these arguments. If this were a case in court, being tried before us as finders of fact, we are not sure which way we would come out. The evidence, and much of it is not really hard "evidence" at all, but rather more or less informed opinion as to what may happen in the future, is in equipoise, or very nearly so. This is just the kind of situation, though, we think, in which courts should be especially alert to resist the temptation to substitute their judgment for that of the agency deputized by Congress to make the decision in the first instance. We shall try to explain why.

DOT found "that the American route transfer is more likely to benefit than harm TWA's viability." Order 91–4–47, *supra*, slip op. 28. TWA is deeply in debt. It has defaulted on some notes. Its own management believes, and has repeatedly represented both to DOT and to us, that it needs the cash more than it needs the routes. Absent approval of the route transfer, TWA told DOT, it would have to file for protection under Chapter 11 of the Bank-

ruptcy Code, and, while bankruptcy is a solution for some businesses, the experience of Eastern Airlines shows that it won't necessarily work. The three routes in question in the multi-route case did have an operating profit at one time, but the airline as a whole has consistently had both operating and net losses in recent years, and these losses increased in the fourth quarter of 1990. Factors beyond TWA's control account for much of this bad news, factors like the increase in fuel prices and reduced travel because of the public's apprehension about war in the Persian Gulf. Other carriers have felt the impact of these factors as well, but TWA's already weak financial condition makes it much more vulnerable than, say, American or Delta. It may be, as petitioners argue, that TWA's financial troubles stem from its recapitalization in 1988. At that time, according to petitioners, TWA's principal owner, Carl Icahn, took the company private, essentially withdrawing in cash all of his own investment, and leaving the company so highly leveraged as to be in jeopardy of failure. In petitioners' view, Mr. Icahn is the villain of this piece, but that characterization, right or wrong, is beside the point. DOT had to deal with the situation as it found it, and in that situation TWA was already precariously weak. It needed to reduce its debt, and the only practical way to get enough money to put a substantial dent in the debt was to sell some or all of its London routes. These routes were profitable, at least at one time, but if they had not been they would not have been candidates for a lucrative transfer. It is the very profitability, or potential profitability, of the routes that makes attempting to sell them sensible. No one suggests that TWA has anything else to sell that would realize anywhere near as much money. Nor does anyone suggest any other way for TWA to pull itself out of the hole of debt it has dug for itself.

Maybe TWA ultimately will go under, or at least go into reorganization. Even if this is so, the viability factor does not necessarily weigh in petitioners' favor. The issue is not whether the transfers will make TWA viable, but whether it will more likely than not be more viable with the transfers than without them. Herein lies the chief consideration in favor of what DOT did: these very routes, though profitable in the past, were beginning to lose money, when costs are allocated on a fully distributed basis, see Goldman, Sachs letter, Resp.App. 165–66, and doing nothing might well get for TWA the worst of both worlds: it would have no new infusion of cash, and the London routes, now highly saleable, would decline in value, thus producing neither an operating profit nor an advantageous sale.[3] Remember that TWA, if it keeps these routes, will have to compete against United, as well as against British Airways, and there is reason to believe that this competition will be substantially stiffer than that formerly provided by Pan American.

The most troubling aspect of this point remains to be discussed. It is TWA's failure to indicate to DOT what it planned to do with the money. TWA's management said it needed the money, that the money would enhance its competitive position, that the money was more important to it than the routes, but it never said, nor did DOT even ask, what it was going to do with the money. We are tempted to remand the case to the agency with directions to determine TWA's intended use of the funds, and then to re-evaluate the issue of viability on the basis of that use. Some conceivable uses of the money, surely, would contribute more to financial viability than others. If, for example, TWA were immediately to distribute the entire sum received in both route-sale proceedings as a special dividend to its common shareholders, TWA would

---

**3.** When the case was before the agency, a third party, Tracinda Corporation, backed by a Los Angeles investor, Kirk Kerkorian, presented a plan to buy TWA. Petitioners favored this plan. DOT found that it was not feasible. Petitioners raise no question in this Court about this finding. "Petitioners are not seeking review here of the Agency's findings with respect to the [Tracinda] proposal." Brief for Petitioners p. 10 n. 9. With the disappearance of the Tracinda alternative as an issue, no alternative to approval of the route sales remains other than the status quo, in which TWA appears to be continuing its decline.

end up with neither the routes nor the money, and it could hardly be said that the route sale would enhance its viability as an operating airline. (Enter again the spectre of Mr. Icahn: 90 per cent. of the common stock is owned by him or by entities controlled by or affiliated with him.) DOT answers that it has no authority to require TWA to use the money in any particular way, but this answer does not satisfy us. Of course TWA can spend its money however it likes. DOT does have power, however, to approve or disapprove the sale of the routes. The intended use of the money, good or bad, could logically influence that decision. DOT could well disapprove a transfer if it found the proceeds would not be used in such a way as to benefit the carrier as an ongoing business. Benefit to the carrier's owners or security holders is not the same thing as benefit to the carrier. Benefit to the former is a private benefit. Benefit to the latter is a public benefit, and DOT is admonished to disapprove any transfer not in "the public interest."

Despite these reservations, however, we believe that DOT's order should be upheld. We reach this conclusion essentially for two reasons.

*First.* We now know what TWA plans to do with the money. On May 16, 1991, TWA offered to purchase for cash five classes of its debt securities: equipment trust certificates, to be bought for 73 cents on the dollar;[4] 15 per cent. senior secured notes, to be bought for 65 cents on the dollar; 16 per cent. senior notes due 1992 and 17–and–¼ per cent. senior notes due 1993, for 35 cents on the dollar; and 12 per cent. junior subordinated debentures for 17–and–½ cents on the dollar. If the offers are successful, 1.37 billion dollars of current debt will be retired at an estimated

cost of 482 million dollars. TWA will be considerably less in debt, and will therefore be healthier, or at least so it represents. The offering document informs the public that, whether or not the offer is successful, TWA plans to stop any further payment, principal or interest, on any of its debt for the foreseeable future. The offering document warns that unless major financial problems (for example, pending suits) are solved, "TWA likely will file for protection from its creditors under Chapter 11 of the Bankruptcy Code," and "an involuntary bankruptcy petition could be filed at any time against TWA." Thus, even with the proceeds of the route sales, TWA's financial picture is hardly bright. The important point for present purposes, though, is that the picture would probably be darker still if TWA did not have the cash with which to make the pending offer.[5]

Before DOT, no one denied that TWA needed to do something about its debt. Tracinda, in fact, took the affirmative position that TWA would have to buy back a large portion of its debt. See Resp.App. 122–23. Debt retirement, though not specifically committed to, was definitely in the picture, then, when DOT decided the case. If DOT had asked TWA what it planned to do with the money, the reply would no doubt have been something very much along the lines of the present debt-retirement program, differing perhaps in detail but not in important substance. There is no reason to suppose that such an answer would have altered in any way DOT's disposition to believe that the route sales were in TWA's financial interest. Accordingly, we can see no practical purpose to be served at this point by remanding the case to DOT with instructions to require TWA

---

4. On May 29, 1991, TWA amended this offer to 77–and–½ cents on the dollar. The trustee for the holders of equipment trust certificates, in return, agreed to a stay of various lawsuits pending against TWA.

5. The offering circular we refer to was not in the record before DOT—necessarily so, because it was not issued until May 16, 1991. We nevertheless feel free to refer to it, because all parties acknowledge that the offer is in fact being made. There is no dispute of fact, in other

words, as to the existence or terms of the offer. Petitioners argue, Reply Brief pp. 8–9 n. 4, that Mr. Icahn and his "entities" are getting favored treatment under the offer. We have no idea whether this is true or not, and we are content to leave this issue to the parties directly affected. If other TWA security holders feel aggrieved, potential remedies exist. We are informed that some of these security holders have commenced an action in the Southern District of New York.

to specify its intended use of the money. We know the intended use, and we also know, or believe to a moral certainty, that this intended use, if it had been considered by DOT at the time, would not have altered the Department's decision. Further, a remand at this point would have the serious disadvantage of injecting tremendous business uncertainty into this already shaky picture. Such a remand, presumably, would prevent TWA from using the proceeds of the route sales at least until proceedings on remand could be completed, a process that could take some time. In the meantime, TWA would be operating routes it does not want and would be without the use of the cash it does want. This seems to us a recipe for disaster, not merely threatening to put TWA under, but virtually guaranteed to do so.

*Second.* The other point, and it is legally dispositive, is that DOT would have approved these transfers even without the viability finding that it made. The Department said: "Although we find that the transfer should strengthen TWA's viability, we would approve it even if we were not making that finding, since it will provide significant public benefits." Order 91–4–47, *supra*, slip op. 29 n. 40. In other words, if we were to hold DOT's viability finding invalid, and remand to the Department for further proceedings, the same result would be reached: the route sales would still be approved. If such a holding is legally within the Department's authority, a remand on the issue of viability would be a complete futility, legally meaningless. We hold that the Department, under the governing statute, does have that authority. Congress has determined that viability is an important public-interest factor. That much is clear from the 1990 amendment. The legislative history of that amendment makes it equally clear that viability is not a *sine qua non* of approval. If the public benefits in the form of increased competition with foreign carriers on the part of American are substantial enough, the failure of the transaction to improve TWA's viability, though a factor cutting against

approval, would not be significant enough to cause disapproval by DOT: it would be outweighed by those public benefits. This sort of weighing of one public-interest factor against another is preeminently a function for an expert agency, not a court. The agency is trusted by Congress to make this sort of judgment; we are not. We have power to set such a decision aside for abuse of discretion, but it is up to the agency to determine, in the first instance, how to weigh the various factors, and a decision by the agency to weigh increased American ability to compete against foreign carriers much more heavily than a decrease in viability of an already financially weak carrier is not an abuse of discretion. It is simply a policy judgment, not forbidden by anything in the statute, not contrary to any widely accepted public policy found elsewhere, and not susceptible of revision with the tools commonly used by judges—interpretation of language, reasoning by analogy, and application of policies adopted by the popularly elected branches of government. If we were Secretary of Transportation, we might disagree, but that is no basis for overturning the agency's judgment on such a question of policy.

Accordingly, we hold that petitioners' attack on DOT's finding that the sale of these routes will improve TWA's financial viability is unavailing.

### C.

One factor remains—the effect of the transaction on competition in the market for domestic air-transportation services. This point needs no extended discussion. If, as DOT has permissibly found, TWA's viability will be improved, competition in the market for domestic air-transportation services will not be adversely affected. And if the public benefits in the form of increased ability to compete in foreign markets are as great as DOT has permissibly found, they are great enough to outweigh both the viability and the domestic-market factors, to the extent that the latter factor is affected by the former.[6]

**6.** We are aware that DOT has reported to the relevant committees of the Congress, as re-

## VII.

To summarize: the statute is worded in general terms. It gives to DOT the job of deciding what is in "the public interest." This job involves difficult policy judgments, including predictions of what may happen in the airline industry in the future. Our function is closely circumscribed. The points urged by petitioners in the multi-route case are weighty and substantial, but in the end we conclude they are insufficient to carry the day. DOT's decision is not so far out of bounds that judges may upset it.

The orders under review are affirmed.

BEAM, Circuit Judge, dissenting in part.

I respectfully dissent. The ultimate decision to transfer, in the public interest, the three certificates involved in the multi-route proceeding, No. 91–1916, is not supported by substantial evidence. I am especially concerned with the transfer of TWA's New York-to-London route. There is not just a dearth of evidence with regard to the propriety of this move, the proof actually points the other way.

I agree with the analysis of governing statutes made by the majority. I am in specific agreement that the 1990 amendments to 49 U.S.C.App. § 1371(h) require the DOT to pay particular attention to the effect of its actions upon "competition in the domestic airline industry." 49 U.S.C. App. § 1371(h)(3)(B). *See also id.* at § 1302(a)(4) (public interest considerations include placing maximum reliance on actual and potential competition).

Domestic competition is, of course, not the only factor to be considered. It is, however, a very important one.

Much is made by the DOT, the parties and the majority about the continuing viability of TWA. In my view, this issue is only a sub-set of a larger question—how will the DOT action affect domestic air travelers? In other words, TWA's inevitable demise under the scenario approved by the DOT is not important except that it is certain to have a damaging impact upon "competition in the domestic airline industry."

The record reflects the condition of the industry. Three major airlines, Pan American, Continental and Midway, are under the protection of bankruptcy courts in Chapter 11 proceedings. Braniff and Eastern are gone. Several other regional carriers are in financial disarray. To sentence TWA to death when a DOT goal should be maintenance of domestic competition is unfortunate, if not an abuse of discretion. In any event, it is into this state of the industry that we must make our analysis of the evidence underlying the DOT's conclusions.

The DOT has determined that TWA will be viable after transferring the New York-to-London route, and, at least inferentially, that the transfer will not unduly harm domestic competition. The DOT did not independently verify, based on a fully devel-

quired by § 401(h)(3), and that its report has been rejected by the Senate Committee on Commerce, Science, and Transportation. In response to a request we made at oral argument, the Department has furnished us with a copy of a letter dated May 9, 1991, written to the Secretary of Transportation by the Chairmen and Ranking Members of the Senate Committee and its Subcommittee on Aviation. The letter takes the position that the discussion of the relevant public-interest factors in DOT's order "is perfunctory, at best. Neither order contains the thorough analyses contemplated by the Congress in setting this requirement." The letter continues: "We reject the certification pending full compliance with the law...." The question of the legal effect of this letter is not before us, and we have serious doubts that it could be. Congress has imposed a reporting requirement. Congress is itself the judge of whether that re-

quirement has been met, and, if it has not been, of what to do about it. Such reporting requirements are one way Congress has of keeping a handle on the Executive Branch. DOT has complied with the requirement on its face. If Congress believes that the compliance is substantively deficient, it can take legislative action, subject of course to constitutional limits. By the same token, DOT, for its part, may adhere to its chosen course, deciding to accept whatever detriment may come in its future relationship with the Senate Committee. *Cf. American Hospital Association v. National Labor Relations Board,* —— U.S. ——, 111 S.Ct. 1539, 1545–46, 113 L.Ed.2d 675 (1991) (admonition to NLRB in a committee report does not itself create justiciable rights; "the remedy for noncompliance with the admonition is in the hands of the body that issued it.").

oped record, that transferring TWA's New York-to-London route is in the public interest. Instead, the DOT deferred to TWA's opinion that transferring the route is necessary to TWA's viability. *Application of American Airlines, Inc. and Trans World Airlines, Inc.*, No. 91–4–47, at 28 (DOT April 24, 1991) (hereinafter cited as Order) ("the record [gives] us no basis to second-guess the judgment of TWA's management that the transaction [is] necessary for the carrier's continuing viability"). However, as indicated, the DOT's decision that TWA will be a viable carrier after selling the New York-to-London route is not supported by substantial evidence. The proof, as also indicated, supports a contrary conclusion.[1]

The evidence of record indicates the destructive consequences to TWA of transferring this route. Transferring the New York-to-London route will reduce profits from TWA's international flights and further reduce TWA's domestic revenues. TWA's New York-to-London route is the most valuable route TWA owns; it produces profits which greatly exceed any of its other routes, international or domestic. Confidential App. of Petitioners at 28. Revenue from this route, and other profitable international routes, are used to offset losses from TWA's domestic flights. *See* Order at 28; App. of Petitioners at 59. The record establishes that TWA, without the profit from its New York–to–London business, will not be capable of generating sufficient revenue from its remaining routes, domestic and international, to continue future operations, especially when you consider that TWA will no longer have profits from the three additional London routes to be transferred. *See, e.g.,* Confidential App. of Petitioners at 9 (former TWA vice president stating that "selling TWA's London routes would leave the re-

maining airline doomed to lose money"); *see also id.* at 42–45.

In addition to reducing international profits, the record indicates that transferring TWA's New York-to-London route will also negatively impact TWA's domestic revenues. TWA is the largest carrier at New York's JFK airport and TWA has more online connecting flights at JFK than any other carrier. App. of Petitioners at 25–26. TWA's online system "feeds" traffic from its domestic flights to its international flights, and thereby increases revenues on TWA's domestic runs. With the transfer of TWA's New York-to-London route, TWA will lose domestic revenue because of declining traffic on TWA's domestic flights to connecting international flights at JFK. Confidential App. of Petitioners at 38. Moreover, TWA will lose additional domestic revenue from the disruption of its JFK online system as a result of declining travel by frequent flier program members. *Id.* at 35, 37.

Although the sale of these routes may produce an influx of capital for TWA, 445 million dollars, the sale is, at bottom, the exchange of valuable routes necessary to TWA's future for essentially worthless debt. The New York, Boston and Los Angeles-to-London routes produced an operating profit in 1990 of 136 million dollars; the New York-to-London route alone produced 82 million dollars. Confidential App. of Petitioners at 28. TWA's net losses for the same year, while running the three London routes, totalled 237 million. Order at 28. Even if transferring the three London routes will reduce TWA's debt by 1.37 billion, as contemplated by TWA's plan referenced by the majority, TWA will lose an income stream of at least 136 million dollars per year. Without the 136 million dollars, TWA's losses in 1990 would have been at least 373 million dollars, the net

---

**1.** Aside from being contrary to the proof, I think the DOT's decision to accord deference to TWA's business decision is improper for an additional reason. The interests of the DOT and TWA, even under deregulation, are not the same. The DOT is vested with the responsibility of independently verifying that a proposed international transfer is in "the public interest." TWA, on the other hand, is not required to consider the pub-

lic interest, but considers the economic interests of TWA. Indeed, even if a business decision by TWA could be deemed consistent with the public interest on a particular issue, the DOT's reliance on TWA's decision is especially troublesome in this case because the record does not clearly establish that the management of TWA is necessarily acting in the best economic interest of TWA as a continuing, operational airline.

losses of 237 million added to the lost profits from the three London routes of 136 million dollars. Even without the 1.37 billion debt load, large losses will no doubt be incurred in future years. Under current circumstances, it does not appear that TWA will be able to return to an operating profit without at least the profits from the New York-to-London route. It is difficult to see how selling TWA's most valuable routes will produce a healthier TWA in light of the losses experienced while operating the routes.[2]

The DOT's conclusion to transfer the New York-to-London route is also inconsistent with its decision not to transfer TWA's St. Louis-to-London route and thus arbitrary. The DOT's reasons for finding that a transfer of the St. Louis-to-London route is counter to public interest apply equally to TWA's New York-to-London holding. The DOT determined that the public interest will be best served by TWA's retention of the St. Louis-to-London route because "St. Louis is an established TWA hub, at which TWA provides 83 percent of the total flights [and] [n]o carrier other than TWA can proffer an equal or superior competitive influence on the U.S.–U.K. market from St. Louis." Order at 18. However, New York's JFK airport is also an established TWA hub. TWA is the largest carrier at JFK, and has more online flights from JFK than other carriers, including American. App. of Petitioners at 25–26 (TWA has 41 online flights from JFK, whereas American has only 32). Thus, TWA provides the strongest competitive influence from New York's JFK to London. Indeed, TWA's own documents indicate that TWA can be more competitive than American in New York-to-London flights. *Compare* Confidential App. of Petitioners at 28 *with id.* at 31.[3]

Finally, there is no evidence of record establishing TWA's intended use of the proceeds from transferring the London routes at issue. Although TWA's use of the proceeds may ultimately determine its viability, the DOT did not require TWA to submit a business plan setting forth TWA's intended use of the proceeds before the DOT determined that the proceeds were necessary to TWA's viability. The record does not establish whether the proceeds will be used for TWA flight operations or will be used to pay existing investors. A business plan submitted by TWA would have provided a basis for the DOT to evaluate TWA's plans and future viability. Without knowing how the proceeds will be used, the DOT totally lacked an evidentiary basis to find that TWA will be viable after the transfer.[4]

---

**2.** The DOT stated that "[a]lthough we find that the transfer should strengthen TWA's viability, we would approve it even if we were not making that finding, since it will provide significant public benefits." Order at 29 n. 40. This alternative conclusion is difficult to comprehend given the lack of analysis of impact upon domestic airline competition should TWA now go out of business. It also appears to fly directly into the face of the requirement that the DOT consider domestic competition in making its "public interest" decision.

**3.** The majority indicates that transferring TWA's New York-to-London route to American while declining to transfer the St. Louis-to-London route makes sense in light of American's strong presence at JFK. However, despite American's presence at JFK, TWA remains the strongest competitor at JFK for the same reasons the DOT found it was the strongest competitor at St. Louis—its size and the nature of its service.

**4.** The majority refers to TWA's offer to purchase for 482 million dollars certain debt securities in the amount of 1.37 billion dollars as a business plan. I am troubled by the reference to TWA's offer because the offer is not part of the record before us and was not considered by the DOT. However, aside from the record issue, the proposal is deficient in several respects. First, based on the information set forth in the prospectus, it is difficult to discern without expert analysis the specific terms of the offer and the offer's consequences on the viability of TWA. Because the offer was issued after completion of the DOT proceedings, an expert evaluation of the offer was not presented. Second, Carl Icahn and his affiliates own 90 percent of TWA's stock, and a substantial share of the funds proposed to be paid under the offer will purchase bonds also owned by Mr. Icahn and his affiliates. In light of the 90 percent ownership interest, it is not discernible from the offer whether TWA will benefit as much as its investors. Third, the offer is conditioned upon an agreement to subordinate bonds senior to the bonds owned by Mr. Icahn and his affiliates by eliminating bond provisions which prohibit purchase of bonds owned by Mr. Icahn and his affiliates if there has been a default on any

Because there is not substantial evidence in the record supporting the DOT's conclusion respecting TWA's viability after the transfer of the New York-to-London route, the record is, likewise, deficient respecting the harm to the public interest. In the present state of the industry, you cannot immobilize an airline the size of TWA without a disastrous impact upon domestic competition. Thus, the DOT is required, under the law, to make this "competition" analysis upon substantial evidence. Then, and only then, will the DOT be able to balance all required factors, make a reasoned predictive analysis and reach a conclusion on where the public interest lies.

I would remand this case to the DOT for further proceedings on the issue of impact on domestic competition resulting from the proposed transfers. Only then can there be a prediction, based upon substantial evidence, on the harm to the public interest that may result. In the process, I would require TWA to submit a business plan respecting its proposed use of all proceeds. If the additional evidence determines that TWA may succumb in any event, I would also direct the DOT to reconsider whether allowing TWA to retain three London routes is in the public interest.

senior indebtedness. It is not clear from the offer whether the subordination is necessary to implement the offer or whether the condition is for the benefit of Mr. Icahn and his affiliates. In any event, an action by senior bond holders has now resulted in an injunction issued by the District Court for the Southern District of New York prohibiting this move and, thus, placing the entire plan in jeopardy. *Fleet Nat'l Bank v. Trans World Airlines, Inc.,* 767 F.Supp. 510 (S.D.

N.Y.1991). Fourth, TWA's offer to purchase the securities does not specify where the proceeds to be received by Mr. Icahn and affiliates will be applied. Even if the sale proceeds can produce a healthier TWA if fully applied to an operational airline, under the proposal, the proceeds, at least in part, can apparently be moved away from TWA by current investors, possibly exacerbating TWA's demise.